UNITD STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____/

RECOVERY RACING, LLC d/b/a Maserati
of Ft. Lauderdale, a New YorkLimited Liability
Company, RECOVERY RACING III, LLC,
d/b/a Maserati of Long Island, a New York
Limited Liability Company, RECOVERY
RACING V, LLC d/b/a Maserati of Manhattan,          CIVIL ACTION NO.:
a New York Limited Liability Company,
RECOVERY RACING VIII, LLC, d/b/a
Gold Coast Maserati, a New York Limited
Liability Company, and RECOVERY RACING
IX, LLC, d/b/a Maserati of Bergen County, a New
Jersey Limited Liability Company,

          Plaintiffs,

v.

MASERATI NORTH AMERICA, INC.,
a California corporation,

          Defendant.
_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Recovery Racing, LLC d/b/a Maserati of Ft. Lauderdale ("Maserati of Ft.

Lauderdale"), Recovery Racing III, LLC d/b/a Maserati of Long Island ("Maserati of Long

Island"), Recovery Racing, V, LLC d/b/a Maserati of Manhattan ("Maserati of Manhattan"),

Recovery Racing VIII, LLC, d/b/a Gold Coast Maserati ("Gold Coast Maserati"), and Recovery

Racing IX, LLC, d/b/a Maserati of Bergen County ("Maserati of Bergen County") by their

attorneys, Bellavia Blatt & Crossett, PC, complaining of the defendant of Maserati North

America. Inc. ("MNA") allege as follows:

## JURISDICTION AND VENUE

1.      This Court possesses jurisdiction over this action pursuant to 28 U.S.C. Section 1331 as this Court has original jurisdiction of all civil actions arising under the laws of the United States (*i.e.,* U.S.C.A. 1221, et seq.; 18 U.S.C. 1962(C) and 15 U.S.C. 13(a)).

2.      At all times material to this action, Defendant MNA operated, conducted, engaged in or carried on a business venture and conducted extensive business dealings in this State by selling Maserati automobiles and other Maserati branded products within the State of New York. MNA has committed the tortuous acts described below in this state. Accordingly, this Court has personal jurisdiction over Defendant MNA.

3.      This Court also has in personam jurisdiction over Defendant MNA because MNA has engaged in substantial and non isolated activity within this State including, but not limited to, maintaining dealerships in this State in order to sell its vehicles and supplying dealerships with new motor vehicles, parts, and accessories to its dealers in this judicial district. Defendant MNA maintains systematic and continuous business contacts with this judicial district.

4.      Venue is proper in this District pursuant to 28 U.S.C. Section 1391(a) because the places of business with respect to plaintiffs Maserati of Long Island and Gold Coast Maserati are located in this District and a substantial part of the events giving rise to Plaintiffs' claims occurred in this district.

5.      This Court has supplemental jurisdiction over the pendent state law claims herein pursuant to 28 U.S.C. § 1367.

## PARTIES

6.     At all times hereinafter mentioned, Plaintiff Maserati of Ft. Lauderdale is a limited liability company organized under the laws of the State of New York with its principal place of business at 5750 North Federal Highway, Ft. Lauderdale, Florida 33308.

7.     At all relevant times hereinafter mentioned, Maserati of Ft. Lauderdale was and still is engaged in the business of operating an automobile dealership selling and servicing, among other things, Maserati automobiles.

8.     At all relevant times hereinafter mentioned, Maserati of Ft. Lauderdale was and is an authorized sales and service dealer of Maserati vehicles, having entered into an automotive dealer agreement with defendant MNA.

9.     At all relevant times hereinafter mentioned, Maserati of Ft. Lauderdale is a licensed "motor vehicle dealer" operating as a "franchised motor vehicle dealer" as defined by the Florida Franchise Motor Vehicle Dealer Act (the "Florida Act") §320.60(11)(a)(1) and in accordance with §320.27(1) of the Florida Act.

10.     At all relevant times hereinafter mentioned, Plaintiff Maserati of Long Island is a limited liability company organized under the laws of the State of New York with its principal place of business at 65 S. Service Road, Plainview, New York 11803.

11.     At all relevant times hereinafter mentioned, Maserati of Long Island was and still is engaged in the business of operating an automobile dealership selling and servicing, among other things, Maserati automobiles.

12.     At all relevant times hereinafter mentioned, Maserati of Long Island was and is an authorized sales and service dealer of Maserati vehicles, having entered into an automotive dealer agreement with defendant MNA.

13.     At all relevant times hereinafter mentioned, Maserati of Long Island is a licensed "franchised motor vehicle dealer" as defined by Article 17-A, section 462(7), New York Vehicle and Traffic Law and operates under a "franchise" as defined by Article 17-A, section 462(6), New York Vehicle and Traffic Law (the "New York Act").

14.     At all relevant times hereinafter mentioned, Plaintiff Maserati of Manhattan is a limited liability company organized under the laws of the State of New York with its principal place of business at 1 York Street, New York, New York 10013.

15.     At all relevant times hereinafter mentioned, Maserati of Manhattan was and still is engaged in the business of operating an automobile dealership selling and servicing, among other things, Maserati automobiles.

16.     At all relevant times hereinafter mentioned, Maserati of Manhattan was and is an authorized sales and service dealer of Maserati vehicles, having entered into an automotive dealer agreement with defendant MNA.

17.     At all relevant times hereinafter mentioned, Maserati of Manhattan is a licensed "franchised motor vehicle dealer" as defined by Article 17-A, Section 462(7) of the New York Act and operates under a "franchise" as defined by Article 17-A, Section 462(6) of the New York Act.

18.     At all relevant times hereinafter mentioned, Plaintiff Gold Coast Maserati is a limited liability company organized under the laws of the State of New York with its principal place of business at 90 Northern Boulevard, Great Neck, New York 10021.

19.     At all relevant times hereinafter mentioned, Gold Coast Maserati was and still is engaged in the business of operating an automobile dealership selling and servicing, among other things, Maserati automobiles.

20.     At all relevant times hereinafter mentioned, Gold Coast Maserati was and is an authorized sales and service dealer of Maserati vehicles, having entered into an automotive dealer agreement with defendant MNA.

21.     At all relevant times hereinafter mentioned, Gold Coast Maserati is a licensed "franchised motor vehicle dealer" as defined by Article 17-A, Section 462(7) of the New York Act and operates under a "franchise" as defined by Article 17-A, Section 462(6) of the New York Act.

22.     At all relevant times hereinafter mentioned, Plaintiff Maserati of Bergen County is a limited liability company organized under the laws of the State of New Jersey with its principal place of business at 145 Route 17 South, Upper Saddle River, New Jersey 07458.

23.     At all relevant times hereinafter mentioned, Maserati of Bergen County was and still is, engaged in the business of operating an automobile dealership selling and servicing, among other things, Maserati automobiles.

24.     At all relevant times hereinafter mentioned, Maserati of Bergen County was and is an authorized sales and service dealer of Maserati vehicles, having entered into an automotive dealer agreement with defendant MNA.

25.     At all relevant times hereinafter mentioned, Maserati of Bergen County is a ""Motor vehicle franchisee" as defined by the New Jersey Franchise Practices Act (the

"New Jersey Act") Section 56:10-13 and operates under a "Motor vehicle franchise" as defined by Section 56:10-13 of the New Jersey Act

26.     Defendant MNA is a corporation organized and existing under the laws of the State of California with its principal place of business in Englewood Cliffs, New Jersey.

27.     Upon information and belief, at all times hereinafter mentioned, Defendant MNA is a manufacturer and distributor for retail sale, through its authorized franchised dealers, of Maserati motor vehicles, parts and accessories.

28.     Defendant MNA is both a "distributor" and a "franchisor" as defined by Article 17-A, Sections 462(1) and 462(8) of the New York Act, is a "Distributor" as defined by §320.60(5)of the Florida Act and a "Motor vehicle franchisor" as defined by Sections 56:10-13 and 56:10-16(e) of the New Jersey Act.

## GENERAL ALLEGATIONS

### Plaintiffs' Commitment to the Maserati Brand

29.     The Plaintiffs operate Maserati dealerships in Manhattan, Plainview and Great Neck, New York, as well as Ft. Lauderdale, Florida and Upper Saddle River, New Jersey under Defendant MNA's Dealer Agreements with each Plaintiff.

30.     Plaintiffs are authorized to sell new Maserati vehicles and Maserati branded accessories.

31.     Plaintiffs perform factory authorized warranty and service work on Maserati vehicles and their repair and services are charged to Defendant MNA and paid by it in Florida, New York and New Jersey.  In addition to the foregoing, each Plaintiff engages in an ancillary business related to the sale of Maserati vehicles include the sale of used vehicles taken in trade against Maserati vehicles.

32.     On February 16, 2007, Maserati of Long Island entered into a Dealer Retail Sales & Service Agreement ("Dealer Agreement") with Defendant MNA.  That agreement authorized this Plaintiff to operate as a franchised motor vehicle dealership of Defendant MNA in a territory within New York as defined in the agreement (the "Long Island Dealer Agreement").

33.     On September 21, 2010, Maserati of Manhattan entered into a Dealer Agreement with Defendant MNA.  That agreement authorized this Plaintiff to operate as a franchised motor vehicle dealership of Defendant MNA in a territory of New York defined in the agreement (the "Manhattan Dealer Agreement").

34.     On July 2, 2008, Maserati of Ft. Lauderdale entered into a Dealer Agreement with Defendant MNA.  That agreement authorized this Plaintiff to operate as a franchised motor vehicle dealership of Defendant MNA in a territory within Florida as defined in the agreement (the "Ft. Lauderdale Dealer Agreement").

35.     On November 10, 2014, Gold Coast Maserati entered into a Dealer Agreement with Defendant MNA.  That agreement authorized this Plaintiff to operate as a franchised motor vehicle dealership of Defendant MNA in a territory within New York as defined in the agreement. (the "Gold Coast Dealer Agreement").

36.     On September 20, 2013, Maserati of Bergen County entered into a Dealer Agreement with Defendant MNA.  That agreement authorized this Plaintiff to operate as a franchised motor vehicle dealership of Defendant MNA in a territory within New Jersey as defined in the agreement. (the "Bergen County Dealer Agreement").

37.     Stuart Hayim ("Hayim"), the owner and operator of the Plaintiff dealerships, caused Maserati of Ft. Lauderdale to expend over $30 million in connection with the acquisition and development of the Florida Maserati franchise alone.

38.     Since the inception of his relationship with Defendant MNA in 2007 and continuing through the present, Hayim has caused the Hayim Maserati dealerships to invest over $98,000,000 (Ninety-Eight Million Dollars) in capital toward the acquisition of sales and service locations, development of dealership facilities, investments in vehicle and parts inventory and investments in working capital in connection with the dealerships.

39.     The Plaintiff dealerships have consistently exhibited dedication and loyalty to the Maserati brand by exceeding assigned sales objectives and, at MNA's request, developing sales programs for MNA.

40.     Based upon Plaintiffs' commitment to MNA, after purchasing and operating the Plainview, New York and Ft. Lauderdale, Florida Maserati franchises, Hayim was awarded the Manhattan, Great Neck and Upper Saddle River Maserati franchises described herein above.

41.     As a result of the Plaintiffs' dedication, leadership, loyalty and success, throughout the parties' entire relationship, Hayim enjoyed the respect and confidence of MNA.

42.     In 2010, Plaintiffs Maserati of Ft. Lauderdale and Maserati of Long Island comprised two (2) of the top three (3) Maserati dealerships nationally.

43.     During 2011, Defendant's then President and CEO, Mark McNabb ("McNabb"), contacted Hayim expressing concerns regarding Defendant MNA's ability to meet its

own year-end assigned sales objectives and called upon Plaintiffs Maserati of Ft. Lauderdale, Maserati of Manhattan and Maserati of Long Island, as MNA's top performing dealerships, to assist MNA in achieving its national sales goals.

44.    As a result, Hayim and MNA's then President and CEO, McNabb, initiated "Operation Condor."  Operating Condor was an "all-out effort" by the Plaintiffs Maserati of Ft. Lauderdale, Maserati of Manhattan and Maserati of Long Island to sell as many Maserati vehicles as possible by year-end of the 2011 calendar year incurring significant additional advertising and marketing costs solely to assist Defendant MNA in the sale of its cars but with the anticipated effect of reducing profits for the year as to each of these Plaintiffs. To achieve Maserati's goals, these Plaintiffs agreed to more than double their marketing and sales budget and thereby attract new customers for their Maserati cars without regard to dealer profit.

45.    The additional costs expended by Plaintiffs Maserati of Ft. Lauderdale, Maserati of Manhattan and Maserati of Long Island under Operation Condor caused these Plaintiffs to significantly reduce their profits on the sale of vehicles during year-end 2011 to assist MNA.

46.    On August 12, 2011, MNA's President and CEO, McNabb, sent Hayim a letter on behalf of MNA commending these Plaintiffs on their year to date sales performance.

47.    On January 4, 2012, MNA's then President and CEO, McNabb, sent Hayim a letter advising that, for the 2011 calendar year, Plaintiffs Maserati of Ft. Lauderdale, Maserati of Manhattan and Maserati of Long Island, in addition to outperforming all United States dealerships, sold more Maserati vehicles than those sold in any other individual country except China.

48.     In 2012, because the then operating Plaintiffs were so successful with Operation Condor, MNA's then President and CEO, McNabb, again called upon Plaintiffs Maserati of Ft. Lauderdale, Maserati of Manhattan and Maserati of Long Island to institute and lead a year-end sales push for that year. The program was called "Operation Condor 2" and it requested additional dealerships to follow these Plaintiffs' example and participate.

### Maserati's Major Change in Sales Approach

49.     While the year-end sales pushes requested by MNA in 2011 and 2012 coincided with Maserati's planned growth, Defendant MNA decided to change its strategy from a brand focused exclusively on high cost vehicles (purposefully marked by low sales volumes) to adding lower priced brand with greater sales volume.

50.     The transition to a volume driven brand was solidified in the Fall of 2011. Maserati then CEO Harold Wester ("Wester"), announced at a North American dealer conference in Bologna, Italy that Maserati intended to shift its brand focus to maximize sales and attract a greater portion of the "luxury" car market by producing a vehicle which would retail for approximately $70,000.00, less than half the sticker price of previous Maserati vehicles.

51.     The lower priced vehicle, known as the "Ghibli," would be introduced in 2013 to compete with Mercedes-Benz E class and BMW 5 Series vehicles.

52.     Further, Wester additionally announced that market studies would be undertaken in each targeted market to expand the dealer network into different areas of the United States where the brand lacked an adequate presence to accommodate the expanded target demographics, i.e. unrepresented areas where residents traditionally were believed to be priced out of purchasing Maserati vehicles.

53.     In reliance on Defendant MNA's planned growth of the Maserati brand, Hayim, in the Spring of 2012, committed to the funding of new Recovery Racing dealerships to be located in Bergen County (i.e., Plaintiff Bergen County Maserati), New Jersey at a cost of over $6.1 million (between acquisition of the land, construction and build out of the dealership facility) and Great Neck, New York (i.e., Plaintiff Gold Coast Maserati) at a cost of over $5.5 million (between acquisition of land and construction of the dealership and services facilities).

### Maserati's Consideration of an Additional Dealership in South Florida

54.     On December 10, 2012, MNA gave Plaintiff Maserati of Ft. Lauderdale notice of MNA's intent to expand its dealer network in South Florida.

55.     In the notice, MNA advised that pursuant to the Article B of the Ft. Lauderdale Dealer Agreement, it was providing Maserati of Ft. Lauderdale with thirty (30) days' notice for it to provide MNA with "input and whether you believe that any new dealers should be appointed in the southeastern Florida market and if so, whether Recovery Racing should be appointed to provide such representation."

56.     Hayim responded on December 12, 2012 by advising that the Southeast Florida region was already fully saturated with Maserati dealers, one in in Palm Beach, one in Coral Gables and Plaintiff Maserati of Ft. Lauderdale.  These three (3) dealerships are located within75 miles of each other, an extremely dense cluster of dealerships compared to other MNA dealer networks nationally. Hayim noted that Maserati of Ft. Lauderdale had experienced significant losses when the Palm Beach dealership was added in 2009. This was due to lost sales to the new Palm Beach dealer which significantly reduced the amount of territory that previously had been fully serviced by Maserati of Ft. Lauderdale.

57.     Hayim requested that MNA table the additional dealer idea for six (6) months to allow an evaluation of the need for additional dealerships by MNA and the role Plaintiff Maserati of Ft. Lauderdale could play, or how MNA would compensate Maserati of Ft. Lauderdale for its losses by repaying the same.

58.     On December 19, 2012, MNA responded to Maserati of Ft. Lauderdale's request by assuring Hayim that MNA would perform a detailed market analysis to determine if a need for an additional dealer was clearly evident prior to awarding any new dealership points in the South Florida market. MNA promised that it would not "further saturate a market with dealers."

59.     By letter agreement dated January 10, 2013, McNabb, on behalf of Defendant MNA, represented, promised and agreed that "if MNA does decide to add an additional point in the [Southeastern Florida] market, we [MNA] will allow you [Maserati of Ft. Lauderdale] the opportunity to present us with a detailed 5 year business and facility proposal to meet our market share targets."

60.     While Plaintiffs awaited the outcome of the study promised by MNA in December 2012, Defendant's then President and CEO, McNabb, retired from MNA in the spring of 2013. After a brief period of management by an interim president, on November 11, 2013 Peter Grady ("Grady") assumed the role of President of MNA.

**MNA's Decides to Add an Additional South Florida Dealership**

61.     Prior to performing any study as promised, or first permitting Maserati of Ft. Lauderdale the opportunity to present MNA with a detailed 5 year business and facility proposal to meet MNA's market share targets, as agreed to in its letter of January 20, 2013, or even first offering the Davie dealership to Plaintiff Maserati of Ft. Lauderdale,

on February 14, 2014, Alex Salamone ("Salamone"), MNA's Director of Business Development and Financial Services, telephoned Hayim to advise him that MNA had mailed Maserati of Ft. Lauderdale a notice informing of its official decision to add an additional dealership in Davie, Florida.

62.     Despite Defendant MNA previously advising Hayim of MNA's institution of a corporate policy to conduct market studies prior to making any decision to add an additional dealership and Defendant's then President and CEO, McNabb, sending a December 19, 2012 letter advising that a market study was being commenced, and despite repeated requests from Hayim, MNA failed and refused to provide Hayim and the Plaintiffs with any market studies supporting MNA's decision to open an additional dealership in Davie or otherwise evidencing that such a dealership would not saturate the market.

63.     Based upon the foregoing behavior, upon information and belief, Plaintiffs assert that MNA failed to conduct market studies in the South Florida region prior to rendering its decision to open an additional dealership in Davie, Florida.

64.     MNA's unilateral decision to award a Davie dealership, without conducting market studies or analyzing the impact this would have on Maserati of Ft. Lauderdale, violated (a) MNA's corporate policy and was in violation of the Maserati of Ft. Lauderdale Dealer Agreement and the duty of good faith and fair dealing and (b) the representations made by MNA in its letter agreement dated January 10, 2013 in which it represented, promised and agreed that "if MNA does decide to add an additional point in the [Southeastern Florida] market, we [MNA] will allow you [Maserati of Ft. Lauderdale]

the opportunity to present us with a detailed 5 year business and facility proposal to meet our market share targets."

65.    During the February 14, 2014 telephone call, Defendant advised Hayim that MNA had already decided that Maserati of Ft. Lauderdale would not be considered for the new dealership in Davie.  Defendant MNA falsely asserted that this decision was due to MNA's policy of avoiding awarding contiguously located Maserati dealerships to a single franchisee despite the fact that MNA had recently awarded the Hayim family an additional dealership in Great Neck, New York, the location contiguous to Plaintiff Maserati of Long Island's dealership.

66.    Further, Defendant's statements were in direct contravention of the express language of the Ft. Lauderdale Dealer Agreement signed by both parties. Article B of the Ft. Lauderdale Dealer Agreement provides, in relevant part, that "if Maserati decides to appoint, or to consider whether to appoint, another dealer in or near Dealer's market area, Maserati shall promptly notify Dealer thereof, and consult with Dealer as to (a) whether a new dealer should in fact be appointed in such market area and if so (b) whether Dealer should be appointed to provide such representation."

67.    At the time of Defendant's phone call, MNA had already entered into negotiations with Rick Case Automotive, a large South Florida automobile dealer with no previous Maserati dealership, in breach of the Ft. Lauderdale Dealer Agreement and in violation of Maserati's own policies for selecting a new dealer.

68.    On February 19, 2014, Plaintiffs received formal notice of MNA's decision to open a new Maserati dealership in Davie, Florida (the "Dealership Notice").

69.    Even though it was already determined by Defendant that Maserati of Ft. Lauderdale would not be considered for the new dealership in Davie, Florida, the Dealership Notice stated that, in accordance with Article B of the Dealership Agreement, Defendant MNA was providing thirty (30) days' notice to Maserati of Ft. Lauderdale to provide its input on whether a new dealer should be appointed for Davie and whether Maserati of Ft. Lauderdale should be considered.

70.    The Dealership Notice claimed to reference market research allegedly conducted by MNA substantiating MNA's decision to open a new dealership in Davie.  However, as of the present date, and despite numerous prior representations, MNA has refused to provide Plaintiffs with the market research that supports the opening of a new Maserati dealership in Davie, Florida.   In contrast, Defendant has provided Plaintiffs with manipulated market data in an attempt to support their decision to open a new Maserati dealership in Davie.

71.    Shortly after Maserati of Ft. Lauderdale received the Dealership Notice, Hayim flew to Bologna, Italy to meet with Wester, the CEO of Maserati S.p.A., to address Defendant MNA's misconduct. Prior to this meeting, Hayim learned that MNA was additionally considering adding a new Maserati dealership point in Smithtown, New York, only 20 miles from Maserati of Long Island.  The placement of this prospective dealership would have had devastating consequences on Plaintiff Maserati of Long Island, which was established in 2007 at a cost of over $27 million between the acquisition of the land and the construction and build out of the dealership facility.

72.    At the meeting, Hayim advised Wester that Maserati of Ft. Lauderdale intended to exercise its statutory right to protest the addition of the new dealership in Davie given the

devastating consequences that the additional dealership would have on Maserati of Ft. Lauderdale and that MNA had violated the terms of the January 10, 2013 letter agreement.

73.      Hayim initially agreed to not file a protest under Florida law regarding the opening of a new Maserati dealership in Davie solely because Wester attempted to remedy MNA's breach of the January 10, 2013 letter agreement by offering the Plaintiffs several dispensations, including, but not limited to, awarding Hayim with an Alpha Romeo franchise. However, following the meeting, MNA reneged on its purported dispensations and indicated that MNA intended to proceed with awarding the new dealership.

74.      On March 17, 2014, Hayim, accompanied by his son Gregg Hayim, the General Manager of Maserati of Long Island, who was and is during the relevant time period in charge of the day to day operations at this dealership, flew to Detroit to meet with Grady for the purpose of obtaining MNA's purported market studies demonstrating that an additional dealership in Davie was necessary.

75.      On May 12, 2014, Maserati of Ft. Lauderdale received official notice from MNA that the Davie dealership was awarded to Rick Case's newly formed entity, Rick Case Weston, LLC.  Shortly thereafter MNA began removing, and reassigning to Rick Case, a significant portion of the Broward County territory previously assigned to Maserati of Ft. Lauderdale.

76.      During the remainder of May 2014, Hayim, on behalf of Maserati of Ft. Lauderdale, realizing that Grady was acting in bad faith, contacted Wester regarding the data Plaintiffs had provided to MNA evidencing that the new dealership was unnecessary

and would have devastating consequences for Maserati of Ft. Lauderdale. In response, Wester referred to MNA's alleged data supporting the opening of a new South Florida Maserati dealership but, like Grady, Wester failed and/or refused to provide any of this alleged MNA data to Maserati of Ft. Lauderdale.

77.    Thereafter, Maserati of Ft. Lauderdale filed a formal protest regarding Defendant MNA's award, pursuant to Fla. Stat. §320.642, of a Davie, Florida Maserati franchise to Rick Case Maserati.

78.    By recommended order of the Division Administrative Hearings that was adopted by the State of Florida Department of Highway Safety and Motor Vehicles (the "Order"), it was found that Plaintiff Maserati of Ft. Lauderdale lacked standing to protest MNA's application for a Maserati dealership in Davie Florida purportedly because Maserati of Ft. Lauderdale did not meet the requirement that in excess of 25% of its "retail sales" to persons with "registered household addresses" be within a 12.5 mile radius of the proposed location in "any 12-month period' between May 1, 2011 and April 30, 2014 (Section 320.642(3)(b)2 of the Florida Act).

79.    Plaintiff Maserati of Florida has filed an appeal from the Order with the District Court of Appeal of the State of Florida - Fourth District. As of the date of the filing of the within complaint – such appeal is pending.

80.    Upon information and belief, Defendant MNA has retaliated against Plaintiffs (a) as a result of filing the above referenced formal protest regarding Defendant MNA's award, pursuant to Fla. Stat.§320.642, of a Davie, Florida Maserati franchise to Rick Case Weston, LLC, and (b) as shown herein below, Plaintiffs' refusal to be complicit in Defendant's illegal vehicle punching scheme.

81.    As just one example, even though the Davie, Florida Maserati franchise has yet to even open, in an effort to make it appear that Plaintiffs are underperforming, Defendant MNA has provided Plaintiffs with manipulated market penetration reports (Maserati Registration Effectiveness Reports) in which it omits substantial sales completed by Maserati of Ft. Lauderdale in certain parts of Florida not yet even assigned to Rick Case Weston, LLC.

82.    Likewise, subsequent to filing a formal protest regarding Defendant MNA's award, pursuant to Fla. Stat.§320.642, of a Davie, Florida Maserati franchise to Rick Case Weston, LLC, Defendant MNA without justification or reason, removed market areas (zip codes) from Maserati of Bergen County and assigned them, without justification, to existing New Jersey Maserati dealerships that are competing with Plaintiffs.

## MNA Establishes Discriminatory Sales Incentive Programs

83.    Commencing in approximately the beginning of 2014, Defendant Maserati promulgated and enacted the herein after described discriminatory dealer incentive programs. Upon information and belief, the discriminatory dealer incentive programs were initially promulgated to favor and unfairly assist smaller newer Maserati dealers. Upon information and belief, thereafter, other discriminatory dealer incentive and/or marketing programs have and were promulgated for the purpose of rewarding certain Maserati dealerships that were complicit in the fraudulent vehicle punching scheme set forth herein below.

84.     The Defendant's discriminatory incentive programs implemented impermissible and discriminatory pricing schemes that severely prejudiced and damaged Plaintiffs and wrongfully benefited others Maserati dealers.

85.     The Defendant's discriminatory incentive programs (a) violated the New York Act, the Florida Act, the New Jersey Act, and the Federal Automobile Dealer's Day in Court Act and (b) as applied to Plaintiffs, constituted a breach of the common law duties of good faith and fair dealing implied covenants contained in the parties' dealer agreements.

86.     The discriminatory incentive programs provided, and provide, varying bonuses, incentives or payments to Defendant's franchised dealers.

87.     The discriminatory incentive programs were and are flawed as the program incentives were and are not available to Plaintiffs on a proportionally equal basis as they are to other Maserati dealers.

88.     Under the discriminatory incentive programs, some of Defendant's dealers are treated more favorably than others, such as Plaintiffs, resulting in a discriminatory pricing scheme.

89.     The Defendant MNA dealers receiving favorable treatment under the discriminatory incentive programs are able to effectively, purchase and sell new Defendant MNA vehicles at substantially lower prices than those purchased and sold by Defendant MNA dealers, such as Plaintiffs.

90.     This price discrimination equips certain of Defendant MNA's dealers with a substantial and unfair competitive economic advantage over other of Defendant MNA's dealers (such as Plaintiffs) – for example, certain Maserati dealers were able to undercut

the Plaintiffs' prices with no impact on their bottom line, or pocket the difference as additional profit, or do a little of both.

91.     Plaintiffs found themselves, as a result of the discriminatory incentive programs, in a vicious spiral, as other Maserati dealers not only sold new Maserati vehicles at prices that undercut Plaintiffs, but also earned further discriminatory bonuses and incentives on new Defendant MNA sales under the discriminatory incentive programs and other Defendant MNA's programs.

92.     In conjunction with these lost sales resulting from the discriminatory incentive programs, Plaintiffs also lost the opportunity to purchase trade-in vehicles that are a valuable source of income for Plaintiffs' businesses.

93.     In addition to the foregoing, franchised new automobile dealers maintain extremely high penetration rates concerning service for vehicles sold by the dealership. In this respect, each service customer typically averages more than one service visit per year. Thus, to the extent that Plaintiffs lost vehicle sales to the discriminatory incentive programs, Plaintiffs also experienced the loss of multiple service customers and corresponding service visits per year. As Plaintiffs' lose sales due to the discriminatory incentive programs multiply over the years, Plaintiffs' losses to their Service Department business will grow exponentially as the cumulative effect of lost sales over the years will compound lost revenues in the Service Department.

94.     Plaintiffs were and are at a substantial financial disadvantage with regard to the price they effectively paid, when applying the payments received or applied from the discriminatory incentive programs, for new Maserati vehicles purchased from Defendant.

95.     The discriminatory incentive programs described herein dramatically discriminated in favor of certain Maserati dealers and allowed such dealers to reap enormous, discriminatory benefits and incentives which threaten the profitability and going concern value of Plaintiffs.

96.     Plaintiffs, as a result of the discriminatory incentive programs described herein, cannot compete on a level playing field with Defendant MNA dealers that are advantaged under these discriminatory incentive programs.

## The Discriminatory and Illegal Bonus Program

97.     Prior to January 2014, Chrysler-Fiat S.p.A., the parent company of MNA, decided to raise capital through an initial public stock offering. To present an image of greater value of financial strength, Grady, as the CEO of MNA was charged with the responsibility of administering a series of dealer incentive programs aimed at bolstering the number of Maserati vehicle sales MNA sold and/or reported as sold in order to increase Chrysler-Fiat S.p.A.'s appearance of financial strength based on its Maserati brand.

98.     To artificially pump the Maserati sales for the above purpose, MNA developed the illegal incentive programs described herein and directed Maserati dealers to report false sales numbers in excess of normal industry standards.

99.     One incentive program which MNA instituted prior to the IPO was the Maserati Performance Bonus (the "Bonus Program").  The Bonus Program set certain monthly sales objectives which, if met, would result in a retroactive payment of incentive monies for each vehicle sold during the measurement period.

100.    At first, MNA set unattainable monthly sales objectives for the then operating Plaintiffs under the Bonus Program, knowing that the minimum requirement for receiving incentive monies were set at unreasonably high levels and unachievable by the then operating Plaintiff dealerships.

101.    In early 2014, in order to receive incentive monies under the unreasonable Bonus Program, Maserati asked the then operating Plaintiffs to sell approximately multiples of five to seven times the number of Maserati vehicles it had historically sold. These unreasonable sales objectives were not warranted by then operating Plaintiffs' market share.

102.    Hayim requested that MNA provide him with the methodology used in developing the sales objectives assigned to the then operating Plaintiff dealerships under the Bonus Program.  However, MNA initially refused to provide its methodology.

103.    Plaintiffs later learned that, upon information and belief, the methodology used in developing the unreasonable and discriminatory sales objectives assigned to a Maserati dealership utilized both a dealership's sales history and the market share assigned by Maserati to such dealership. Accordingly, other, newer, Maserati dealerships (with no substantive sales history) received more favorable pricing through the Bonus Program, including those against whom the then operating Plaintiffs competed with for Maserati customers.  The favorable pricing for other newer dealerships was tied to far more reasonable sales objectives under the Bonus Program that the other newer dealers would be able to qualify for.

104.    Maserati dealers with more reasonable sales objectives than the then operating Plaintiffs knew that they could and would hit their sales objectives and receive their

incentive monies (which, in certain instances aggregated to several hundreds of thousands of dollars). Accordingly, these Maserati dealers were able to, among other things, from the beginning of each month the discriminatory Bonus Program was in effect, lower their effective cost of new Maserati vehicles below that of the then operating Plaintiffs' vehicle costs who knew that they had no practical or reasonable chance of hitting the discriminatory and illegal sales objectives (which were north of 75 units in certain instances) assigned to them by Maserati (and would therefore not receive the their incentive monies).

105.     Due to MNA's discriminatory Bonus Program, the then operating Plaintiffs were, at the time, effectively prevented from purchasing new Maserati vehicles at competitive prices compared with other Maserati dealerships and suffered a loss of customers and sales.

### The Discriminatory and Illegal Holdback Program

106.     Defendant's dealer pricing is designed to reward successful dealers.  The more of Defendant's cars the dealer sells, the less the dealer pays per car.  One method by which this is achieved is through holdbacks.  When a dealer purchases a new Maserati vehicle from the manufacturer at wholesale, the dealer is charged a premium over and above the actual wholesale price of the vehicle.   These additional premiums are held by the manufacturer and may be refunded to the dealers if certain requirements are met.  In 2014, MNA informed certain of the then operating Plaintiffs that they would no longer be paid holdback monies for vehicles sold outside of each dealership's territory although such sales had been previously recognized by MNA (the "Holdback Program").  In addition, Defendant MNA advised certain of the then operating Plaintiffs, without

justification or cause, that certain of their dealership territories would be reduced, thereby further reducing the territories in which they could sell new Maserati vehicles and be paid holdback monies.

107.    The then operating Plaintiffs had already established a customer base in the immediate vicinity of their locations. In addition, because, at the time, there was a dearth of Maserati dealerships in certain other areas of the country, Plaintiffs also established a customer base across the United States outside of each of their immediate markets. Providing the then operating Plaintiffs' dealerships with access to disparate geographic locations so that inventory can be sold to consumers outside of a dealership's direct market had always been a key component for their revenues and had been a standard operating practice for all Maserati dealerships including the then operating Plaintiffs. This was accomplished in order to meet customer needs in locations with no Maserati dealerships at MNA's request.

108.    Because MNA refused to initially honor the holdback payments, it caused certain of the then operating Plaintiffs to be deprived of significant amounts of holdback monies. The loss of these funds under the Holdback Program substantially reduced certain of the then operating Plaintiffs' ability to price competitively with other Maserati dealers.  The loss of holdback monies resulted in fewer new Maserati sales for certain of the then operating Plaintiffs and created impossible price barriers preventing them from achieving the inflated sales objectives MNA has set for them under the Bonus Program.

109.    In a discriminatory and unreasonable manner, other Maserati dealers were excluded from the Holdback Program. This was not offered to certain of the then operating Plaintiffs. These competing dealerships adjusted the prices of their vehicles

accordingly because they were aware, from the beginning of each month in which certain of the Plaintiffs were subject to the Holdback Program, that they would receive payment of holdback monies for vehicles sold outside of their dealership's assigned territory.

110.    While the then operating Plaintiffs did eventually receive holdback monies for vehicles sold to consumers outside of a dealership's direct market, Maserati dealers who were advised that they were excluded from the Holdback Program knew that they would receive the payment of holdback monies unavailable, at the time, to certain of the then operating Plaintiffs. Accordingly, these Maserati dealers were able to, at the time, among other things, lower their effective cost of new Maserati vehicles below that of certain the then operating Plaintiffs' vehicle costs who were told that they would not receive holdback monies for vehicles sold to consumers outside of a dealership's direct market

111.    Combining the discriminatory effects of the Bonus Program with the loss of income under the Holdback Program, other dealerships were able to, at the time, sell Maserati vehicles for substantially less than certain of the then operating Plaintiffs.  As a result, these Plaintiffs suffered a substantial loss of sales and customers.

112.    The lost Maserati sales described above, in addition to the lost incentive and holdback monies, also caused the loss of profits routinely obtained incidental to a sale including revenue from insurance, parts and service and trade ins.

113.    These losses have the long term effect of reducing future income generated from satisfied customers and reduce the value of the dealership.

**MNA Employs a Fraudulent Vehicle Punching
Scheme to Give The Appearance of Greater Financial Strength
In Connection with its Parent Company's Initial Public Offering**

114.    As part of the desire to create the appearance of MNA's financial strength in connection with the upcoming Fiat-Chrysler, S.p.A. IPO, upon information and belief, MNA charged Grady, as the CEO of MNA, with the responsibility of instituting a corporate program to falsely inflate the number of Maserati vehicles MNA reported as sold.

115.    In the retail automotive industry, a vehicle is deemed sold when it is "punched."

116.    A vehicle is punched when a digital Retail Delivery Report ("RDR card") is prepared after a customer executes a binding sales agreement for the purchase of a new vehicle.

117.    The RDR card is then sent to the distributor/franchisor for use in demonstrating that: a) the vehicle is unavailable for dealer-trade or dealer vehicle inventory; b) for allocation purposes; and c) for customer information and d) for warranty records.

118.    Maserati dealers are required to maintain an adequate supply of demonstrator vehicles in their fleet which are used for prospective customers to test-drive vehicles. Normally, industry standard is to have one demonstrator vehicle for each model contained in the manufacturer's vehicle line.

119.    An RDR card may be punched when a new Maserati vehicle is added to the dealership's demonstrator fleet because, for that limited time, the car is not available for dealer trades. Demonstrators are ultimately sold to retail customer as new vehicles and, if sold within six months of being added to the dealer's demonstrator fleet, the purchaser obtains the full Maserati warranty on the vehicle.

120.     When a Maserati demonstrator is sold, the RDR card is amended to show the actual retail customer information including customer name, address and contact information for warranty information and for purposes of reaching the customer if safety recalls issue.

121.     When a Maserati demonstrator vehicle is traded to another dealership in a dealer to dealer transaction, there is no mechanism for the RDR card to be revised to reflect the trade to the receiving dealer.  However, the RDR card remains with the original dealer. Accordingly, the RDR card cannot be updated upon the sale of the vehicle by the receiving dealer to a retail customer.

122.     In this event, no customer contact information will be on file for these vehicles in the event of a warranty or recall thus violating 49 U.S.C. § 30117 (b) (1).

123.     Pursuant to the prior practice and policy of Defendant MNA, demonstrator vehicles would not normally qualify for sales incentives or monthly sales objectives until the vehicle was sold to a retail customer.

124.     In the Fall of 2014 (September 23, 2014), however, Defendant MNA advised its dealers that it was commencing a new Ghibli Performance Bonus which would apply to all new and unreported MY 2014 Maserati Ghiblis and MY 2015 Maserati Ghiblis sold during a certain period of time.

125.     Pursuant to the Ghibli Performance bonus (the "Ghibli Performance Bonus"), (a) accomplishing 75% if a dealer's objective would result in a bonus of $750 per vehicle retroactive to the date the first vehicle was reported; (b) accomplishing 100% of a dealer's objective would result in an additional bonus of $1,250 for a total of $2,000 per vehicle retroactive to the date first new vehicle was reported; and (c) accomplishing

125% of a dealer's objective would result in an additional bonus of $1,000 for a total of $3,000 per vehicle retroactive to the date first new vehicle was reported.

126.    In connection with the Ghibli Performance Bonus, and prior to the IPO, on September 29, 2014, Rick Fuller, the Regional Sales Vice President for MNA, sent an email demanding that every Maserati dealer demonstrator punch (and thereby give the appearance of a retail sale), by September 30, 2014, a 2015 MY Ghibli demonstrator vehicle, even though such cars had not even been delivered by MNA to its dealers at that time.

127.    As an incentive for Maserati dealers to comply with the above illegal directive, the dealers were advised that the vehicle illegally punched as a demonstrator would "Count toward the MPB program for September as a counter AND payer."

128.    In this manner, Defendant MNA asked its dealers to falsely document receipt of a 2015 Ghibli by progressing the car to dealer inventory and then punching an RDR card listing the vehicle as a demonstrator even though the vehicle was not even in the dealership's possession.  At that time, the Ghibli model vehicle had not been billed out by MNA to the dealers and was not paid for by dealers. Stated otherwise, it was falsely reported that the vehicle in question (a) was shipped, (b) accepted by the complicit dealer and (c) certified, by the complicit dealer, that there were no damages to the vehicle punched into demonstrator status as it was accepted.

129.    Upon information and belief, through the above referenced illegal scheme alone, Defendant MNA was able to artificially and falsely inflate the number of Maserati vehicles reported as allegedly sold in September 2014 alone by approximately 105 vehicles (one for every Maserati dealership).

130.     In addition to demanding and providing an illegal incentive to dealers to punch a new Ghibli into demonstrator status before the dealers had received the vehicle, on or about September 30, 2014, Rick Fuller, sent an email advising dealers that they "must" retail or demonstrator punch by 9 p.m. that night all 2014 MY GranTurismo, GranTurismo Convertible Sport, and GranTurismo Convertible MC vehicles in their dealer stock or MNA would cause the dealership to lose all future incentive monies on those vehicles, despite the vast oversaturation of the demonstrator fleet that this caused.

131.     In this manner, and continuing with its fraudulent scheme to artificially inflate purported retail sales in connection with the Chrysler Fiat S.P.A. IPO described herein above, at the end of September 2014, MNA, in effect, instructed its dealers to punch all Ghibli vehicles assigned to them as demonstrators, an unprecedented measure completely unjustified by a need for demonstrators.

132.     As an inducement for dealers to comply with the fraudulent scheme to artificially inflate sales in connection with the Chrysler Fiat S.P.A. IPO, dealers were informed that they would receive full higher or additional incentives on each Ghibli when punched as a demonstrator vehicle and then when the vehicle was later sold to a retail customer. The Maserati dealers that complied with the fraudulent scheme obtained and operated at a substantial economic advantage over the Maserati dealers that did not.

133.     Some dealers complied and punched a substantial amount of vehicles into demonstrator status.  As just one example, on October 1, 2014, Rick Fuller emailed the then operating Plaintiffs with a report that showed Maserati of Westlake with sales of 102 Maserati vehicles in September 2014 alone, most of which, upon information and belief,

were just demonstrator vehicles that were illegally punched to give the appearance that they were retail sold to customers.

134.    Those dealers that were complicit with this fraudulent scheme received hundreds of thousands of dollars in incentive monies (the Ghibli and Granturismo punching scheme is collectively referred to as the "Vehicle Punching Scheme").

135.    When the then operating Plaintiffs realized that the Vehicle Punching Scheme was an artifice, these Plaintiffs advised MNA that it disputed the legality of the Vehicle Punching Scheme and would not punch vehicles as previously directed.

136.    Nevertheless, MNA proceeded with the Vehicle Punching Scheme with other Maserati dealerships and caused those dealers to falsely punch certain vehicles and report them as sold in order to inflate sales to support the IPO.

137.    The then operating Plaintiffs refused to participate in this scheme, placing them at significant price and/or economic disadvantage as well as at odds with Grady and others at Defendant MNA.

138.    Dealers participating in the Vehicle Punching Scheme obtained, among other things, an additional price advantage for each Ghibli punched as a demonstrator unit as opposed to the then operating Plaintiffs' dealerships' cost as well as other incentives.

139.    These competing Maserati dealers that participated in the Vehicle Punching Scheme were able to, among other things, advertise their discounted prices, both online and in the Wall Street Journal, attracting customers from locations throughout the United States.  As a result, the then operating Plaintiffs lost sales because they could not meet the same retail sale price for Ghibli vehicles.

140.    Through the Vehicle Punching Scheme, one Maserati dealer rocketed to number one with over one hundred and two (102) sales in one month and one hundred and fifty five sales in another month, many of which were not retail sales but merely vehicles punched into demonstrator status.  Upon information and belief, this was the first time that it was reported that a Maserati dealer had purportedly broken fifty (50) sales in a one month period.

141.    Other Maserati dealerships who participated in the fraudulent Vehicle Punching Scheme also significantly increased sales.

142.    MNA's scheme enabled it to provide the appearance that its sales volume in the United States was much more significant than in actuality.

143.    As a result of the Vehicle Punching Scheme instituted by MNA, in October, 2014, MNA reported in emails and press releases a remarkable 300% increase in purported retail sales, with total sales of 1,367 vehicles. Upon information and belief, hundreds of these sales were vehicles punched into demonstrator status and not yet sold to a retail customer.

144.    Therefore, MNA utilized the Vehicle Punching Scheme to artificially inflate its sales and profits to misrepresent the financial condition of Chrysler-Fiat S.p.A. in its IPO.

145.    Upon information and belief, the dealerships participating in MNA's Vehicle Punching Scheme continued into early 2015 to hold a large inventory of 2014 vehicles which were punched but not sold to a retail customer.

146.    On or about the end of December 2014, Defendant MNA again advised its dealers to assist it with artificially inflating its vehicle sales by again punching vehicles into demonstrator status. In connection therewith, the then operating Plaintiffs complained to

Defendant MNA that other Maserati dealers should not receive incentive monies for falsely reported sales through the Vehicle punching Scheme. Defendant MNA falsely advised the then operating Plaintiffs that Defendant MNA would take back any incentive funds received by any Maserati dealerships who falsely inflated sales by punching vehicles into demonstrator status.

147.    Despite this representation, as requested by Defendant MNA, the Vehicle Punching Scheme continued. On December 31, 2014 Rick Fuller forwarded an email indicating that Maserati of Westlake had sold 70 Maserati vehicles in December 2014 and Maserati, as a whole, had sold 743 vehicles in December 2014. On January 2, 2015, a mere 2 days later, Rick Fuller forwarded an email indicating that Maserati of Westlake had allegedly sold 155 vehicles in December 2014 and Maserati, as a whole, had sold 1431 vehicles in December 2014 (almost double what was reported two days earlier!). Upon information and belief, the purported increase in vehicles allegedly sold by both Maserati of Westlake and Defendant Maserati in December 2014 was due to vehicles punched into demonstrator status and not yet sold to a retail customer.

148.    In fact, on February 3, 2015, upon information and belief, without the aid of any incentives for falsely reporting vehicle by punching them into demonstrator status, Rick Fuller forwarded an email indicating that Maserati of Westlake had sold only 17 vehicles in January 2015 and Maserati, as a whole, had sold 466 vehicles in January 2015.

149.    On or about April 15, 2015, Brad Davis, Head of Sales Operations for MNA, at a meeting concerning Ally (a lending institution), attended by Garrett Hayim, the Manager of Maserati of Ft. Lauderdale, stated to Garrett Hayim that this remaining unsold inventory (i.e., the demonstrator vehicles that were fraudulently reported as sold)

constituted the sales responsibility of <u>all</u> Maserati dealers including Plaintiffs.  Davis

further admitted that the Maserati programs described herein were unequally or

discriminatorily affecting certain Maserati dealers, like Plaintiffs, thereby reducing the

Plaintiffs' ability to compete fairly with other favored dealers.

**The DiscriminatoryAnd Illegal MNA**
**<u>Programs Available Only to California Maserati Dealers</u>**

150.    Upon information and belief, sometime in early 2015, Defendant MNA provided

its dealers with certain Maserati Sales Incentive Bulletins announcing sales incentives on

certain 2014 and 2015 Maserati vehicles only sold to California residents (the

"Discriminatory California Support Program").  Plaintiffs are unaware as to exactly how

long the Discriminatory California Support Program had been in effect.

151.    Due to the fact that Plaintiffs had established a customer base across the United

States outside of each of their immediate markets, the Discriminatory California Support

Program unreasonably and discriminatorily favored certain California dealers, like

Maserati of Westlake, who predominately sold new Maserati vehicles within California

(i.e., their existing market areas) to California residents.

152.    Upon information and belief, the Discriminatory California Support Program was

intentionally promulgated to aid and assist dealers such as Maserati of Westlake, who

were stuck with large inventories of vehicles that were previously reported as sold

because they were punched into demonstrator status in order to, among other things,

assist Defendant MNA with fraudulently inflating its sales figures.

153.     The Discriminatory California Support Program was an impermissible and

discriminatory pricing scheme that severely prejudiced and damaged Plaintiffs by

wrongfully having the effect of benefiting others Maserati dealers such as Maserati of Westlake.

154.    All conditions precedent to the maintenance of this action have been performed, have occurred or have been waived.

## **FIRST CLAIM**

### **(Violation of § 466(2)(g) of the New York Act)**

155.    Plaintiffs  repeat, reiterate and realleges all of the allegations contained in paragraphs 1 through 154 as if each were more fully set forth at length herein.

156.    The New York Act § 460 et. seq. expresses the New York legislature's concern over, and effort to remedy, past abuses which franchisors have inflicted upon their franchisees.

157.     The New York Act provides at § 460, as follows:

> The legislature finds and declares that the distribution and sale of motor vehicles within this state vitally affects the general economy of the state and public interest and the public welfare and, that in order to promote the public interest and the public welfare and in the exercise of its police power, it is necessary to regulate motor vehicle manufacturers, distributors and factory or distributor representatives and to regulate dealers of motor vehicles doing business in this state in order to prevent frauds, impositions and other abuses upon its citizens and to protect and preserve the investments and properties of the citizens of this state.

158.     The New York Act further provides statutory protections for motor vehicle franchisees in their dealings with motor vehicle franchisors.

159.    Plaintiffs Maserati of Manhattan, Maserati of Long Island and Gold Coast Maserati (the "New York Plaintiffs") are "franchised motor vehicle dealer[s]" within the meaning of Section 462(7) of the New York Act.

160.    Defendant MNA is a "franchisor" within the meaning of Section 462(8) of the New York Act.

161.    The Dealer Agreement between Defendant MNA and each of the New York Plaintiffs is a "franchise" within the meaning of Section 462(6) of the New York Act.

162.    New York State law prohibits franchisors from enacting any scheme which allows one franchisee to sell a vehicle for less than another similarly situated franchisee.

163.    Specifically New York State Vehicle and Franchise Law Section 463(2)(g) states:

> It shall be unlawful for any franchisor to sell or offer to sell any new motor vehicle to any franchised motor vehicle dealer at a lower actual price therefor than the actual price offered to any other franchised motor vehicle dealer for the same model vehicle similarly equipped or to utilize any device including, but not limited to, sales promotion plans or programs which result in such lesser actual price.

164.    Under the Bonus Program, Plaintiffs Maserati of Manhattan and Maserati of Long Island were deprived of significant per car incentives from MNA as a result of its inability to meet the discriminatory and unreasonable sales objectives set by Defendant MNA.

165.    The qualifying sales objectives set by Defendant MNA under the Bonus Program were not reasonably available to Maserati of Manhattan and Maserati of Long Island on a proportionally equal basis in comparison to other Maserati dealers.

166.    As a result of MNA's failure to pay per car incentives under the Bonus Program to Maserati of Manhattan and Maserati of Long Island on a proportionally equal basis in comparison to other Maserati dealers, these Plaintiffs, in effect, paid a higher net price

per vehicle than other Maserati dealers, including other Maserati dealerships located in the State of New York.

167.   Under the Holdback Program, Plaintiff Maserati of Manhattan was initially deprived of significant per car incentives from Defendant MNA as a result of MNA's refusal to provide these dealerships with the exclusions from this program that were received by favored dealers on a discriminatory basis.

168.   The requirements set by Defendant MNA under the Holdback Program was not initially reasonably available to Plaintiff Maserati of Manhattan on a proportionally equal basis in comparison to other Maserati dealers as a result of the location of the customer base for Plaintiff Maserati of Manhattan and inability to obtain certain exclusions from the program offered to other Maserati dealers.

169.   The exclusion to the Holdback Program that Defendant MNA provided to other Maserati dealers was not reasonably available to Plaintiff Maserati of Manhattan on a proportionally equal basis in comparison to other Maserati dealers.

170.   While the then operating Plaintiffs did eventually receive holdback monies for vehicles sold to consumers outside of a dealership's direct market, Maserati dealers who were advised that they would receive certain exclusions from the Holdback Program knew that they would receive the payment of holdback monies unavailable, at the time, to then operating Plaintiff Maserati of Manhattan. Accordingly, these Maserati dealers were able to, at the time, among other things, lower their effective cost of new Maserati vehicles below that of Maserati of Manhattan's vehicle costs who was told that it would not receive holdback monies for vehicles sold to consumers outside of a dealership's direct market

171.    Under the Discriminatory California Support Program, the New York Plaintiffs were effectively deprived of significant per car incentives from Defendant MNA with respect to certain Maserati vehicles. These incentives were not initially available to the New York Plaintiffs on an equal basis in comparison to California Maserati dealers because the Discriminatory California Support Program unreasonably and discriminatorily favored California dealers, like Maserati of Westlake, who predominately sold new Maserati vehicles within California (i.e., their existing market areas) to California residents.

172.    Defendant MNA's bad faith conduct and wrongful acts as set forth above, violates Section 463(2)(g) of the New York Act.

173.    As a result of Defendant MNA's violation of Section 463(2)(g) of the New York Act, the Plaintiffs have, as applicable, sustained and will sustain substantial damages in an amount to be determined at trial but in no event less than $200,000,000.

## SECOND CLAIM

### (Violation Of § 463(2)(aa) Of The New York Act)

174.    Plaintiffs' repeat, reiterate and reallege all of the allegations contained in paragraphs 1 through 173 as if each were more fully set forth at length herein.

175.    New York State law prohibits price discrimination in the sale of motor vehicles to franchised dealers.

176.    Specifically the New York Act Section 463(2)(aa) states that it shall be unlawful for any franchisor "[t]o sell directly to a franchised motor vehicle dealer . . . motor vehicles . . . at a price that is lower than the price which the franchisor charges to all other franchises motor vehicle dealers . . . "

177.    Defendant MNA's bad faith conduct and wrongful acts as set forth above, including, but not limited to, the Bonus Program, the Holdback Program, and the Discriminatory California Support Program, violates Section 463(2)(aa) of the New York Act.

178.    As a result of Defendant MNA's violation of Section 463(2)(aa) of the New York Act, the Plaintiffs, as applicable, have sustained and will sustain substantial damages in an amount to be determined at trial but in no event less than $200,000,000.

### THIRD CLAIM

### (Violation Of § 463(2)(gg) Of The New York Act)

179.    Plaintiffs' repeat, reiterate and reallege all of the allegations contained in paragraphs 1 through 177 as if each were more fully set forth at length herein.

180.    It is a violation of Section 463(2)(gg) of the New York Act for a motor vehicle franchisor "to use an unreasonable, arbitrary or unfair sales or other performance standard in determining the franchised motor vehicle dealer's compliance with a franchise agreement.  Before applying any sales, service or other performance standard to a franchised motor vehicle dealer, a franchisor shall communicate the performance standard in writing in a clear and concise manner."

181.    Under the Bonus Program, the Holdback Program, the Vehicle Punching Scheme and the Discriminatory California Support Program, Defendant MNA used an unreasonable, discriminatory and unfair performance standard for Plaintiffs, as applicable, to qualify for incentives on the sale of Maserati vehicles.

182.    Additionally, Defendant MNA did not provide Plaintiffs, as applicable, with a clear and concise statement in writing as to the terms of the Bonus Program, the

Holdback Program, the Vehicle Punching Scheme or the Discriminatory California Support Program prior to, or after, implementation of such programs.

183.    As a direct and proximate result of Defendant MNA's violations, the Plaintiffs, as applicable, have been damaged. Without receipt of the subject incentives, Plaintiffs, as applicable, lost sales of new Maserati vehicles as described above.  As a result of these lost sales, the sales performance of the relevant Plaintiffs, as measured by the Dealer Agreements was negatively impacted.

184.    Defendant MNA's bad faith conduct and wrongful acts as set forth above, including, but not limited to, the Bonus Program, the Holdback Program, the Vehicle Punching Scheme and the Discriminatory California Support Program, violate Section 463(2)(gg) of the New York Act.

185.    As a result of Defendant MNA's violation of Section 463(2)(gg) of the New York Act, Plaintiffs, as applicable, have sustained and will sustain substantial damages in an amount to be determined at trial but in no event less than $200,000,000.

## FOURTH CLAIM

### (Violation Of § 466(1) Of The New York Act)

186.    Plaintiffs repeat, reiterate and reallege all of the allegations contained in paragraphs 1 through 184 as if each were more fully set forth at length herein.

187.    It is a violation of Section 466(1) of the New York Act for a motor vehicle franchisor "to impose unreasonable restrictions on the franchised motor vehicle dealer relative to . . . compliance with subjective standards . . . ."

188.    Under the Bonus Program, the Holdback Program, the Vehicle Punching Scheme and the Discriminatory California Support Program, Defendant MNA used a subjective

and unreasonable performance standard for the New York Plaintiffs, as applicable, to qualify for incentives on the sale of Maserati vehicles.

189.    As a direct and proximate result of MNA's violations, the New York Plaintiffs have been damaged.

190.    Without receipt of these incentives, the New York Plaintiffs lost sales of new Maserati vehicles and the corresponding revenues and additional vehicle allocation associated with those sales.

191.    Defendant MNA's bad faith conduct and wrongful acts as set forth above, including, but not limited to, the Bonus Program, the Holdback Program, the Vehicle Punching Scheme and the Discriminatory California Support Program, violates Section 466(1) of the New York Act.

192.    As a result of Defendant MNA's violation of Section 466(1) of the New York Act, the Plaintiffs, as applicable, have sustained and will sustain substantial damages in an amount to be determined at trial but in no event less than $200,000,000.

## FIFTH CLAIM

### (Violation Of § 463(2)(ii) Of The New York Act)

193.    Plaintiffs' repeat, reiterate and reallege all of the allegations contained in paragraphs 1 through 191 as if each were more fully set forth at length herein.

194.    It is a violation of Section 463(2)(ii) of the New York Act for a motor vehicle franchisor "to allocate new motor vehicles to a franchised motor vehicle dealer based on a program that differentiates between vehicles sales by a franchised motor vehicle dealer within a territory or geographic area assigned to such dealer and vehicle sales outside of such territory or geographic area."

195.     Under the Holdback Program, Defendant MNA initially withheld incentive payments on the sale of vehicles by Plaintiff Maserati of Manhattan which was made outside of the dealerships' assigned territory.

196.     As a result of the Holdback Program, the Plaintiff Maserati of Manhattan was prevented from and/or disadvantaged in making sales outside of their assigned territory resulting in lost sales.

197.     While this Plaintiff did eventually receive holdback monies for vehicles sold to consumers outside of a dealership's direct market, Maserati dealers who were advised that they would receive certain exclusions under the Holdback Program knew that they would receive the payment of holdback monies unavailable, at the time, to this Plaintiff. Accordingly, these Maserati dealers were able to, at the time, among other things, lower their effective cost of new Maserati vehicles below that of the Maserati of Manhattan's vehicle costs who was told that it would not receive holdback monies for vehicles sold to consumers outside of a dealership's direct market.

198.     As a direct and proximate result of MNA's violations, Plaintiff Maserati of Manhattan has been damaged.

199.     Defendant MNA's bad faith conduct and wrongful acts as set forth above, including, but not limited to the Holdback Program violates Section 463(2)(ii) of the New York Act.

200.     As a result of Defendant MNA's violation of Section 463(2)(ii) of the New York Act, Plaintiffs have sustained and will sustain substantial damages in an amount to be determined at trial but in no event less than $200,000,000.

## SIXTH CLAIM

### (Violation Of § 463(2)(b) Of The New York Act)

201.    Plaintiffs repeat, reiterate and reallege all of the allegations contained in paragraphs 1 through 200 as if each were more fully set forth at length herein.

202.    Section 463(2)(b) of the New York Act provides that:

> It shall be unlawful for any franchisor [t]o directly or indirectly coerce or attempt to coerce any franchised motor vehicle dealer to enter any agreement with any franchisor or officer, agent or any other representative thereof, or to do any other act prejudicial to the monetary interest or property rights of said dealer by threatening to cancel any unexpired contractual agreement existing between such franchisor and said dealer.

203.    Defendant MNA's bad faith conduct and wrongful acts as set forth above, including, but not limited to, the Vehicle Punching Scheme in which it (a) on September 29, 2014 demanded that every Maserati dealer demonstrator punch (and thereby give the appearance of a retail sale), by September 30, 2014, a 2015 MY Ghibli demonstrator vehicle, even though such cars had not even been delivered by MNA to its dealers at that time, and (b) on or about September 30, 2014, directed dealers that they "must" retail or demonstrator punch by 9 p.m. that night all 2014 MY GranTurismo, GranTurismo Convertible Sport, and GranTurismo Convertible MC vehicles in their dealer stock or MNA would cause the dealership to lose all future incentive monies on those vehicles, despite the vast oversaturation of the demonstrator fleet that this caused, violate section 463(2)(b) of the New York Act.

204.    As a result of Defendant MNA's violation of Section 463(2)(b) of the New York Act, Plaintiffs have sustained and will sustain substantial damages in an amount to be determined at trial but in no event less than $200,000,000.

## SEVENTH CLAIM

### (Violation of § 463(2)(d)(1) of the New York Act)

205.    Plaintiffs repeat, reiterate and reallege all of the allegations contained in

paragraphs 1 through 204 as if each were more fully set forth at length herein.

206.     § 463(2)(d)(1) of the New York Act provides, in pertinent part, as follows:

> It shall be unlawful for any franchisor to terminate, cancel or refuse to renew the
> franchise of any franchised motor vehicle dealer except for due cause, regardless
> of the terms of the franchise.

207.    The actions of Defendant MNA have and will result in significant and substantial

damages to be sustained by Plaintiffs' including the destruction of Plaintiffs' business.

208.    The above-actions by Defendant MNA are restrictions upon Plaintiffs' right to own

and operate Maserati franchised dealerships and will devastate Plaintiffs' parts, service

and sales business.

209.    The above actions on the part of Defendant MNA toward Plaintiffs are tantamount

to a constructive termination of the Dealer Agreement without due cause.

210.    Defendant MNA's bad faith conduct and wrongful acts as set forth above violate

Section 463(2)(d)(1) of the New York Act.

211.    As a result of Defendant MNA's violation of Section 463(2)(d)(1) of the New

York Act, Plaintiffs have sustained and will sustain substantial damages in an amount to

be determined at trial but in no event less than $200,000,000.

## EIGHTH CLAIM

## Violation of §320.64(18) of the Florida Act

212.    Plaintiffs repeat, reiterate and reallege all of the allegations contained in paragraphs 1 through 211 as if each were more fully set forth at length herein.

213.    §320.64(18) of the Florida Act prohibits a manufacturer from establishing a system of motor vehicle allocation to its franchised motor vehicle dealers which is unfair, inequitable, unreasonably discriminatory, and not supported by reason or good cause after considering the equities of the affected motor vehicle dealers.

214.    Thorough the implementation of the Bonus Program, Holdback Program, the Vehicle Punching Scheme, and the Discriminatory California Support Program and thereafter though its manipulation of sales data and territory information in a manner which failed to provide full credit to Plaintiff Maserati of Ft. Lauderdale for the vehicles it sold, Defendant MNA's vehicle allocation and distribution was implemented in a manner which was unfair, inequitable, unnecessary discriminatory, and not supported by reason or good cause after considering the equities in violation of §320.64(18) of the Florida Act.

215.    As a direct and proximate result of Defendant MNA's conduct and the violations they committed, Plaintiff Maserati of Ft. Lauderdale has been damaged.  These damages include lost profits on the retail sale of the vehicles, including Defendant MNA incentive monies, profits generated by other areas of the dealership in conjunction with the sale of a new vehicle, including but not limited to finance and insurance, trade-in vehicle sales and service, and legacy purchases through the customer.

216.     Pursuant to Fla. Stat. §320.697, Plaintiff Maserati of Florida seeks damages in an amount three times the pecuniary loss suffered.

217.     Defendant MNA's bad faith conduct and wrongful acts as set forth above violate Fla. Stat. §320.64(18).

218.      As a result of Defendant MNA's violation of Fla. Stat. §320.64(18), Plaintiffs have sustained and will sustain substantial damages in an amount to be determined at trial but in no event less than $200,000,000.

## NINTH CLAIM

### Violation of §320.64(4) of the Florida Act

219.     Plaintiffs repeat, reiterate and reallege all of the allegations contained in paragraphs 1 through 218 as if each were more fully set forth at length herein.

220.     §320.64(4) of the Florida Act prohibit a manufacturer from "indulg[ing] in any illegal act relating to his or her business."

221.     Through the Vehicle Punching Scheme, Defendant MNA: (a) asked its dealers to falsely document receipt of a certain vehicles by progressing such vehicles to dealer inventory and then punching an RDR card listing the vehicle as a demonstrator even though the vehicle was not even in the dealership's possession, (b) enabled Defendant MNA to provide the appearance that its sales volume in the United States was much more significant than in actuality, (c) reported via emails and press releases a remarkable 300% increase in sales, with total sales of 1,367 vehicles even though, upon information and belief, hundreds of these sales were vehicles punched into demonstrator status and not yet sold to a retail customer and (d) artificially inflated its sales and profits to misrepresent the financial condition of Chrysler-Fiat S.p.A. in its IPO.

222.    As a direct and proximate result of Defendant MNA's violations, Plaintiff Maserati of Ft. Lauderdale has been damaged.  These damages include lost profits on the retail sale of the vehicles, including Defendant MNA incentive monies, profits generated by other areas of the dealership in conjunction with the sale of a new vehicle, including but not limited to finance and insurance, trade-in vehicle sales and service, and legacy purchases through the customer.

223.    Pursuant to Fla. Stat. §320.697, Plaintiff Maserati of Ft. Lauderdale seeks damages in an amount three times the pecuniary loss suffered.

224.    Defendant MNA's bad faith conduct and wrongful acts as set forth above violate §320.64(4) of the Florida Act.

225.    As a result of Defendant MNA's violation of §320.64(4) of the Florida Act, Plaintiffs have has sustained and will sustain substantial damages in an amount to be determined at trial but in no event less than $200,000,000.

## TENTH CLAIM

### (Violation §320.64(6) of the Florida Act)

226.    Plaintiffs repeat, reiterate and reallege all of the allegations contained in paragraphs 1 through 225 as if each were more fully set forth at length herein.

227.    §320.64(6) of the Florida Act prohibits a manufacturer from "coerc[ing] or attempting to coerce any motor vehicle dealer to enter into any agreement with the licensee."

228.    Defendant MNA's bad faith conduct and wrongful acts as set forth above, including, but not limited to, the Vehicle Punching Scheme in which it (a) on September 29, 2014 demanded that every Maserati dealer demonstrator punch (and thereby give the

appearance of a retail sale), by September 30, 2015, a 2015 MY Ghibli demonstrator vehicle, even though such cars had not even been delivered by MNA to its dealers at that time, and (b) on or about September 30, 2014, directed dealers that they "must" retail or demonstrator punch by 9 p.m. that night all 2014 MY GranTurismo, GranTurismo Convertible Sport, and GranTurismo Convertible MC vehicles in their dealer stock or MNA would cause the dealership to lose all future incentive monies on those vehicles, despite the vast oversaturation of the demonstrator fleet that this caused, violate §320.64(6) of the Florida Act.

229.   As a direct and proximate result of Defendant MNA's violations, Plaintiff Maserati of Ft. Lauderdale has been damaged.  These damages include lost profits on the retail sale of the vehicles, including Defendant MNA incentive monies, profits generated by other areas of the dealership in conjunction with the sale of a new vehicle, including but not limited to finance and insurance, trade-in vehicle sales and service, and legacy purchases through the customer.

230.   Pursuant to Fla. Stat. §320.697, Plaintiff Maserati of Ft. Lauderdale seeks damages in an amount three times the pecuniary loss suffered.

231.   Defendant MNA's bad faith conduct and wrongful acts as set forth above violate Fla. Stat. §320.64(6).

232.    As a result of Defendant MNA's violation of §320.64(6) of the Florida Act, Plaintiffs have sustained and will sustain substantial damages in an amount to be determined at trial but in no event less than $200,000,000.

## FELEVENTH CLAIM

### (Violation Of § 56:10-7.4(a) of the New Jersey Act)

233.     Plaintiffs repeat, reiterate and reallege all of the allegations contained in paragraphs 1 through 232 as if each were more fully set forth at length herein.

234.     It is a violation of Section 56:10-7.4(a) of the New Jersey Act for a motor vehicle franchisor "to impose unreasonable standards of performance . . . . or other requirements upon a motor vehicle franchisee."

235.     Under the Vehicle Punching Scheme and the Discriminatory California Support Program, Defendant MNA used a subjective and unreasonable performance standard for Maserati of Bergen County to qualify for incentives on the sale of Maserati vehicles.

236.     As a direct and proximate result of MNA's violations, Maserati of Bergen County has been damaged.

237.     Without receipt of these incentives, Maserati of Bergen County lost sales of new Maserati vehicles and the corresponding revenues and additional vehicle allocation associated with those sales.

238.     Defendant MNA's bad faith conduct and wrongful acts as set forth above, including, but not limited to, the Vehicle Punching Scheme and the California Port Support Program, violates Section 56:10-7.4(a) of the New Jersey Act.

239.     As a result of Defendant MNA's violation of Section 56:10-7.4(a) of the New Jersey Act, Plaintiffs have sustained and will sustain substantial damages in an amount to be determined at trial but in no event less than $200,000,000.

## TWELFTH CLAIM

### (Violation Of § 56:10-7.4(h) of the New Jersey Act)

240.    Plaintiffs repeat, reiterate and reallege all of the allegations contained in paragraphs 1 through 239 as if each were more fully set forth at length herein.

241.    It is a violation of Section 56:10-7.4(h)  of the New Jersey Act to:

> To fail or refuse to sell or offer to sell to all motor vehicle franchisees in a line make every motor vehicle sold or offered for sale to any motor vehicle franchisee of the same line make, or to fail or refuse to sell or offer to sell such motor vehicles to all motor vehicle franchisees at the same price for a comparably equipped motor vehicle, on the same terms, with no differential in discount, allowance, credit or bonus, and on reasonable, good faith and non-discriminatory allocation and availability terms.

242.    Defendant MNA's bad faith conduct and wrongful acts as set forth above, including, but not limited to, the Discriminatory California Support Program, violates Section 56:10-7.4(h) of the New Jersey Act.

243.     As a result of Defendant MNA's violation of Section 56:10-7.4(h) of the New Jersey Act, Plaintiffs have sustained and will sustain substantial damages in an amount to be determined at trial but in no event less than $200,000,000.

## THIRTEENTH CLAIM

### (Violation Of The Federal Automobile
### Dealer's Day In Court Act (The "ADDCA") 15 U.S.C.A. 1221)

244.    Plaintiffs repeat, reiterate and realleges all of the allegations contained in paragraphs 1 through 243 as if each were more fully set forth at length herein.

245.    The ADDCA (15 U.S.C.A. 1221, et seq.) provides a dealer with a federal cause of action against an automobile manufacturer who has failed to act in good faith regarding a

franchise.

246.    Plaintiffs are "automobile dealer[s]" within the meaning of Section 1221(c) of the ADDCA.

247.     Defendant MNA is an "automobile manufacturer" within the meaning of Section 1221(a) of the ADDCA.

248.    The Dealer Agreements between Defendant MNA and each of the Plaintiffs is a "franchise" within the meaning of Section 1221(b) of the ADDCA.

249.    Defendant MNA's bad faith conduct and wrongful acts as set forth above, violate 15 U.S.C.A. 1221, et seq.

250.    As a result of Defendant MNA's violation of 15 U.S.C.A. 1221, et seq., Plaintiffs has sustained and will sustain substantial damages in an amount to be determined at trial but in no event less than $200,000,000.

## FOURTEENTH  CLAIM

### (Injunction Pursuant To Federal Rules Of Civil Procedure § 65 and § 469 Of The New York Act)

251.    Plaintiffs repeat, reiterate and reallege all of the allegations contained in paragraphs 1 through 250 as if each were more fully set forth at length herein.

252.    Defendant MNA's course of conduct, as set forth above, is, among other things, violative of the New York Act, the Florida Act, The New Jersey Act and the ADCCA and in breach of the good faith and fair dealing implied in every contract.

253.    In the event that Defendant MNA is permitted to continue to implement the above-referenced schemes in such a manner that its program incentives are not available to Plaintiffs on a proportionally equal basis as they are to other Defendant MNA dealers, Plaintiffs will suffer irreparable injury by way of the loss of their entire businesses, their

respective Dealer Agreements will be terminated, and the Plaintiffs will go out of business.

254.    As a direct and proximate result of the foregoing, Plaintiffs are in danger of irreparable harm by the unlawful, discriminatory competitive advantages bestowed upon other Maserati dealers by means of the wrongful actions of Defendant MNA.

255.    Plaintiffs have no adequate remedy at law.

256.    Section 469 of the New York Act establishes a private right of action for violations thereof, and entitles aggrieved dealers to injunctive relief.

257.    Pursuant to Federal Rules of Civil Procedure § 65 and § 469 of the New York Act, Plaintiffs are entitled to a permanent injunction enjoining and restraining Defendant MNA from administering the various illegal incentive  programs described herein in such an unlawful and discriminatory manner that its program incentives are not available to Plaintiffs on a  proportionally equal  basis as they are to other Defendant MNA dealers.

## FIFTEENTH  CLAIMFOR RELIEF

### (Violation of 18 U.S.C. 1962(C) - CIVIL RICO)

258.    Plaintiffs repeat, reiterate and reallege all of the allegations contained in paragraphs 1 through 257 as if each were more fully set forth at length herein.

259.    At all times relevant hereto, Defendant MNA was, and continues to be, an "enterprise" as that term is defined by 18 U.S.C. 1961(4).

260.    At all times relevant hereto, Defendant engaged in, and continues to engage in, activities which affect interstate or foreign commerce.

261.    The Defendant's enterprise was, and continues to be, engaged in the marketing

and distribution of new Maserati automobiles to dealers such as Plaintiffs.

262.    Defendant MNA has committed a predicate act necessary for establishing a RICO violation.

263.     Upon information and belief, Defendant repeatedly reported false sales numbers to, among others, the public and its dealer body, including Plaintiffs, through mail and wire transmittals, including press releases and sales data reported to such trade journals such as Automotive News and via emails directly to Plaintiffs.

264.    At the time Defendant made the above misrepresentations concerning its sales figures, Defendant knew these and similar representations to be false and misleading, and, as stated above, induced and conspired with certain members of its dealer body to report inflated and false sales numbers.

265.    Defendant committed and/or conspired with other dealerships to commit wire fraud in violation of 18 U.S.C. 1343 by devising and carrying out a scheme whereby Defendant transmitted and/or caused to be transmitted, via electronic communications, among other things, fraudulent sales data designed to increase the number of vehicles that Defendant appeared to be selling in the United States market.

266.    Defendant committed and/or conspired with other dealerships to commit said wire fraud on a continuing basis, thus Defendant's fraudulent activities constitute a "pattern of racketeering activity" as that phrase is defined by 18 U.S.C. 1961(1) and (5).

267.    Defendant's actions are known to have occurred since approximately September 2014, and the threat of Defendant engaging in such criminal activity continues to exist.

268.    Other Maserati dealerships have engaged in this punch rigging scheme at Defendant's instruction since September 2014.

269.     As a direct and proximate cause of Defendant's unlawful conduct, Plaintiffs have suffered injury to its business and/or property.

270.     As a result of Defendant MNA's actions, Plaintiffs has sustained and will sustain substantial damages in an amount to be determined at trial but in no event less than $200,000,000, and Plaintiff further demands that any award of compensatory damages be trebled, along with an award of attorney's fees and costs, pursuant to 18 U.S.C. 1964(c).

## SIXTEENTH CLAIMFOR RELIEF

### Breach of Contract (Appointment of Rick Case Dealership)

271.     Plaintiffs repeat, reiterate and reallege all of the allegations contained in paragraphs 1 through 270 as if each were more fully set forth at length herein.

272.     Maserati of Ft. Lauderdale and MNA are parties to the Ft. Lauderdale Dealer Agreement.  Article B under Appointment of Dealer in the Agreement provides that "if Maserati decides to appoint, or to consider whether to appoint, another dealer in or near Dealer's market area, Maserati shall promptly notify Dealer thereof, and consult with Dealer as to (a) whether a new dealer should in fact be appointed in such market area and if so (b) whether Dealer should be appointed to provide such representation."

273.     The Davie dealership location falls within Maserati of Ft. Lauderdale's assigned dealership market area under the Agreement.  This market area was assigned prior to the facility and capital commitment made by Maserati of Ft. Lauderdale, which exceeded $18 million.

274.     By letter agreement dated January 10, 2013, McNabb, on behalf of Defendant MNA, represented, promised and agreed that "if MNA does decide to add an additional

point in the [Southeastern Florida] market, we [MNA] will allow you [Maserati of Ft. Lauderdale] the opportunity to present us with a detailed 5 year business and facility proposal to meet our market share targets."

275.   MNA breached the January 10, 2013 letter agreement and the Ft. Lauderdale Dealer Agreement by:

a)   Failing to consult with Maserati of Ft. Lauderdale regarding whether a new dealership should be appointed in Davie, Florida;

b).   Failing to consult with Maserati of Ft. Lauderdale prior to entering into negotiations with Rick Case regarding the appointment of Rick Case as dealer of the Davie dealership;

c)   Awarding Rick Case the Davie dealership without providing Maserati of Ft. Lauderdale an opportunity to demonstrate that Maserati of Ft. Lauderdale should be appointed as dealer of the Davie location.

276.   As a direct and proximate result of Defendant MNA's breaches, Plaintiff Maserati of Ft. Lauderdale has been damaged.

277.   As a result of Defendant MNA's breaches, Plaintiffs have sustained and will sustain substantial damages in an amount to be determined at trial but in no event less than $200,000,000.

## SEVENTEENTH  CLAIM FOR RELIEF

### (Breach of the Covenant of Good Faith and Fair Dealing)

278.   Plaintiffs repeat, reiterates and realleges each of the allegations contained in paragraphs 1 through 277 as if set forth more fully and at length herein.

279.    As a result of Defendant MNA's bad faith conduct and wrongful acts as set forth above, Defendant MNA has breached the covenant of good faith and fair dealing implied in all contracts, including the Dealer Agreements between Defendant MNA and each of the Plaintiffs at issue herein.

280.    As an example, Maserati of Ft. Lauderdale and MNA are parties to the Ft. Lauderdale Dealer Agreement. Florida law implies a covenant of good faith and fair dealing into all contracts including MNA's obligation to consult with Maserati of Ft. Lauderdale before establishing the Davie dealership location.

281.    Because MNA is the sole source of Maserati products to Maserati dealers, and with its dealers investing substantial capital in their facilities, personnel and fixed assets, there exists a dramatic economic imbalance in the relationship between MNA and its dealers, including Maserati of Ft. Lauderdale.

282.    MNA's economic power in this relationship makes dealers like Maserati of Ft. Lauderdale vulnerable to intentional dealing in bad faith by MNA and its officers.

283.    MNA acted in bad faith regarding the establishment of the Davie, Florida dealership location and the award of the dealership to Rick Case.

284.    MNA failed and/or refused to provide Maserati of Ft. Lauderdale with any data evidencing that the opening of an additional dealership in Davie was necessary or prudent.  Further, MNA refused to provide Maserati of Ft. Lauderdale with any data evidencing that the new dealership should be awarded to a dealer other than Maserati of Ft. Lauderdale and failed to negotiate in good faith with Maserati of Ft. Lauderdale regarding same.

285.    Upon information and belief, MNA made a definitive determination regarding the opening of an additional dealership in Davie prior to sending Maserati of Ft. Lauderdale the Dealership Notice in bad faith.

286.    Upon information and belief, MNA entered into negotiations with Rick Case as a proposed new dealer prior to sending of the Dealership Notice and prior to confer with the Plaintiff as required by the Dealer Agreement in bad faith.

287.    Furthermore, in bad faith MNA provided incentives to other dealers through the Bonus Program, Holdback Program, Vehicle Punching Scheme and the Discriminatory California Support Program, which were not provided or disproportionately provided in a negative manner to the Plaintiffs, as applicable, in bad faith.

288.    Through the Bonus Program, Holdback Program, Vehicle Punching Scheme and the Discriminatory California Support Program, MNA in bad faith deprived Plaintiffs, as applicable, of the benefits associated with a franchisee under their respective Dealer Agreements including by providing Plaintiffs' competitors with dealer incentives while discriminatorily and unreasonably depriving Plaintiffs, as applicable, to these benefits.

289.    As a direct and proximate result of Defendant MNA's breaches of the implied covenant of good faith and fair dealing, Plaintiffs, as applicable, have been damaged.

290.    MNA's breaches have (i) deprived Maserati of Ft. Lauderdale of the opportunity to prevent the loss of a substantial number of customers for which Maserati of Ft. Lauderdale has expended significant monies marketing the sale and service of Maserati vehicles; and (ii) deprived Plaintiffs, as applicable, of new vehicle sales and the profits generated by other areas of the dealership associated with the sale of a new vehicle,

including but not limited to finance and insurance, trade-in vehicle sale and service, and legacy purchases through the customer.

291.    As a result of Defendant MNA's actions, Plaintiffs have sustained and will sustain substantial damages in an amount to be determined at trial but in no event less than $200,000,000.

## EIGHTEENTH CLAIM FOR RELIEF

### (Promissory Estoppel)

292.    Plaintiff repeats, reiterates and realleges each of the allegations contained in paragraphs 1 through 291 as if set forth more fully and at length herein.

293.    As set forth herein, MNA, through its then President, Mark McNabb, promised Maserati of Ft. Lauderdale that it would have the first opportunity to own and operate any Maserati dealership added in South Florida if MNA determined that a dealership should be added.

294.    MNA should have reasonably expected its promise to induce action by Maserati of Ft. Lauderdale in reliance on the promise.

295.    Maserati of Ft. Lauderdale reasonably relied on Defendant MNA's promise by expending additional monies on advertising and marketing and by continuing to improve its facilities in order to serve a larger area of South Florida.

296.    Further, Maserati of Ft. Lauderdale agreed to continue "Operation Condor" and did continue it for all of 2012, thus receiving a much lower profit margin on the sale of vehicles at the expense of selling as many vehicles as possible as requested by MNA in order to continue their parties' positive relationship.

297.   An injustice can only be avoided through enforcement of MNA's promise.

298.   Defendant MNA's award of the Davie, Florida dealership to Rick Case has caused Plaintiff Maserati of Ft. Lauderdale (i) to lose a substantial number of customers to which it had expended significant monies marketing the sale and service of Maserati vehicles in reliance on the promise; and (ii) to lose new vehicle sales and the profits generated by other areas of the dealership associated with the sale of a new vehicle, including but not limited to finance and insurance, trade-in vehicle sale and service, and legacy purchases through the customer.

299.   As a result of Defendant MNA's actions, Plaintiffs have and will sustain substantial damages in an amount to be determined at trial but in no event less than $200,000,000.

## NINETEENTH CLAIM FOR RELIEF

### (Attorneys' Fees)

300.   Plaintiff repeats, reiterates and realleges each of the allegations contained in paragraphs 1 through 299 as if set forth more fully and at length herein.

301.   The New York Act at section 469 provides as follows:

> **Private actions.**A Franchised motor vehicle dealer who is or may be aggrieved by a violation of this article shall be entitled to sue for, and have, injunctive relief and damages in any court of the state having jurisdiction over the parties. In any such action or proceeding, the court may award necessary costs and disbursements plus a reasonable attorney's fee to any party.

302.   The Florida Act at section 320.697 provides as follows:

> **Civil damages.**—Any person who has suffered pecuniary loss or who has been otherwise adversely affected because of a violation by a licensee of ss. 320.60-

320.70, notwithstanding the existence of any other remedies under ss. 320.60-320.70, has a cause of action against the licensee for damages and may recover damages therefor in any court of competent jurisdiction in an amount equal to 3 times the pecuniary loss, together with costs and a reasonable attorney's fee to be assessed by the court.

303.    The New Jersey Act 56:10-10 provides as follows:

Any franchisee may bring an action against its franchisor for violation of this act in the Superior Court of the State of New Jersey to recover damages sustained by reason of any violation of this act and, where appropriate, shall be entitled to injunctive relief. Such franchisee, if successful, shall also be entitled to the costs of the action including but not limited to reasonable attorney's fees.

304.    Plaintiffs have been aggrieved by Defendant MNA's violations of the New York Act, the Florida Act and the New Jersey Act.

305.    Plaintiffs, pursuant to the New York Act, the Florida Act and the New Jersey Act are entitled to an award, as against Defendant MNA, of necessary costs and disbursements plus a reasonable attorney's fee.

306.    Plaintiffs have and will incur attorney's fees, costs and expenses in connection with its enforcement of its rights under the New York Act, the Florida Act, the New Jersey Act and their respective Dealer Agreements, for all of which sums, as determined and allowed by the Court, Plaintiffs are entitled to judgment as against Defendant MNA.

## TWENTIETH CLAIMFOR RELIEF

### (Violation of Robinson-Patman Act, 15 U.S.C. § 13(a))

307.    Plaintiff repeats, reiterates and realleges each of the allegations contained in paragraphs 1 through 306 as if set forth more fully and at length herein.

308.    This is a claim arising under sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, based on MNA's violations of the Robinson-Patman Act, 15 U.S.C. § 13(a).

309.    MNA is a motor vehicle manufacturer engaged in the sale of motor vehicles in interstate commerce.  The Maserati vehicles sold to Plaintiffs and its competitors are transported across state lines to Plaintiffs and its competitors for resale to consumers.

310.    Through the Bonus Program, the Holdback program, the Vehicle Pricing Scheme and the Discriminatory California Support Program, MNA has sold motor vehicles of like grade and quality in contemporaneous interstate sales to Plaintiffs' competitors at lower prices than the prices MNA has offered to Plaintiffs for their purchases of those motor vehicles.

311.    The Plaintiffs compete with other Maserati dealers located in Florida, New York, New Jersey and throughout the United States who pay lower prices for Maserati motor vehicles as a result of the above-referenced discriminatory programs.

312.    The effect of MNA's unlawful and intentional bad faith and discrimination has been substantially to lessen competition between and among Plaintiffs and the other Maserati dealers with which they compete.

313.    Defendant MNA's institution of its various illegal and discriminatory programs has permitted competing Maserati dealerships to lower their retail prices to reflect their lower acquisition cost, forcing Plaintiffs to lose sales, reduce their profit margins, or both.

314.    The discounts and incentives provided to competing Maserati dealers through these programs were and are not functionally available to the Plaintiffs for the reasons

fully set forth above, including MNA setting unreasonably high sales objectives for the Plaintiffs as opposed to other Maserati dealers.

315.    The favored dealers who receive discounts and incentives under these programs were able to lower their retail prices to reflect their lower acquisition cost, forcing the Plaintiffs to lose sales, reduce their profit margins, or both.

316.    The discounts and incentives provided to competing Maserati dealers through the Holdback Program were not, initially, functionally available to the Plaintiffs for the reasons fully set forth above.

317.    While these then operating Plaintiffs did eventually receive holdback monies for vehicles sold to consumers outside of a dealership's direct market, Maserati dealers who were advised that they would receive certain exclusions under the Holdback Program knew that they would receive the payment of holdback monies unavailable, at the time, to then operating Plaintiffs. Accordingly, these Maserati dealers were able to, at the time, among other things, lower their effective cost of new Maserati vehicles below that of the then operating Plaintiffs' vehicle costs who were told that they would not receive holdback monies for vehicles sold to consumers outside of a dealership's direct market

318.    The favored dealers who initially received discounts under the Holdback Program provide no service or savings to MNA which were not provided in identical kind by the Plaintiffs. Each affected dealer maintains an inventory of purchased vehicles on dealership property and competes to sell and service Maserati vehicles in accordance with the Dealer Agreements.

319.    The favored dealers who received discounts and incentives under these illegal and discriminatory programs provide no service or savings to MNA which are not provided in

identical kind by the Plaintiffs.  Each affected dealer maintains an inventory of purchased vehicles on dealership property and competes to sell and service Maserati vehicles in accordance with the Dealer Agreements.

320.    As a direct and proximate result of MNA's violations of the Robinson-Patman Act, Plaintiffs have been damaged.  These damages include: (i) lost sales to favored competitors and the profits associated with those sales; (ii) lost profit margin in an attempt to prevent the loss of such sales; and (iii) lost vehicle allocation which would be earned as a result of additional sales.

321.    Plaintiffs' injuries are the type that the Robinson-Patman Act was designed to prevent and flows from that which makes MNA's conduct unlawful.

WHEREFORE, Plaintiffs demand entry of a judgment against MNA: (a) declaring that MNA has violated the Robinson-Patman Act, 15 U.S.C. § 13(a), by and through its continued implementation of discriminatory price discounts through the Bonus Program, the Holdback Program, the Vehicle Punching Scheme and the California Port Support Program; (b) enjoining MNA's continued implementation of discriminatory pricing through the above-referenced programs, pursuant to 15 U.SC. § 26; (c) awarding treble damages pursuant 15 U.S.C. § 15(a) together with pre-judgment and post-judgment interest; (d) awarding attorney's fees and costs pursuant to 15 U.S.C. § 15(a) and 15 U.S.C. § 26; and (e) granting such other relief this Court deems just and proper.

**(Jury Demand)**

322.    Plaintiffs' demanda trial by jury.

**WHEREFORE**, PLAINTIFFS respectfully demand judgment as follows:

a)      On the First Claim in an amount to be determined at trial but in no event less than $200,000,000;

b)      On the Second Claim in an amount to be determined at trial but in no event less than $200,000,000;

c)      On the Third Claim in an amount to be determined at trial but in no event less than $200,000,000;

d)      On the Fourth Claim in an amount to be determined at trial but in no event less than $200,000,000;

e)      On the Fifth Claim in an amount to be determined at trial but in no event less than $200,000,000;

f)      On the Sixth Claim in an amount to be determined at trial but in no event less than $200,000,000;

g)      On the Seventh Claim in an amount to be determined at trial but in no event less than $200,000,000;

h)      On the Eighth Claim in an amount to be determined at trial but in no event less than $200,000,000;

i)      On the Ninth Claim in an amount to be determined at trial but in no event less than $200,000,000;

j)      On the Tenth Claim in an amount to be determined at trial but in no event less than $200,000,000;

k)      On the Eleventh Claim in an amount to be determined at trial but in no event less than $200,000,000;

l)      On the Twelfth Claim in an amount to be determined at trial but in no event less than $200,000,000;

m)      On the Thirteenth Claim in an amount to be determined at trial but in no event less than $200,000,000;

n)      On the Fourteenth Claim for an injunction, pursuant to the New York Act 469 and the Federal Rules of Civil Procedure § 65, enjoining and restraining, Plaintiffs are entitled to a permanent injunction enjoining and restraining Defendant MNA from administering the various illegal incentive  programs described herein in such an unlawful and discriminatory manner that its program incentives are not available to Plaintiffs on a  proportionally equal  basis as they are to other Defendant MNA dealers;

o)      On the Fifteenth Claim in an amount to be determined at trial but in no event less than $200,000,000 and that any award of compensatory damages be trebled, along with an award of attorney's fees and costs, pursuant to 18 U.S.C. 1964(c);

p)      On the Sixteenth Claim in an amount to be determined at trial but in no event less than $200,000,000;

q)      On the Seventeenth Claim in an amount to be determined at trial but in no event less than $200,000,000;

r)      On the Eighteenth Claim in an amount to be determined at trial but in no event less than $200,000,000;

s)      On the Nineteenth Claim in an amount to be determined by the Court representing reimbursement for Plaintiffs' attorney's fees, costs, and expenses in connection with the enforcement of its rights under the New York Act, the Florida Act, the New Jersey Act, and the Dealer Agreements;

t)      On the Twentieth Claim (a) a declaration that MNA has violated the Robinson-Patman Act, 15 U.S.C. § 13(a), by and through its continued implementation of discriminatory price discounts through the Bonus Program, the Holdback Program, the Vehicle Punching Scheme and the California Port Support Program; (b) enjoining MNA's continued implementation of discriminatory pricing through the above-referenced programs, pursuant to 15 U.SC. § 26; (c) awarding treble damages pursuant 15 U.S.C. § 15(a) together with pre-judgment and post-judgment interest; and (d) awarding attorney's fees and costs pursuant to 15 U.S.C. § 15(a) and 15 U.S.C. § 26;

u)      For the value of the costs and disbursements Plaintiffs incur in connection with this action, including the value of its attorneys' fees; and

v) For such other relief as the Court may seem just, proper and equitable.

Dated: Mineola, New York
       August 28, 2015

                    BELLAVIA BLATT & CROSSETT, PC

        By:   _____
              Leonard A. Bellavia (LB-0780)
              Steven Blatt (SB-6792)
              Attorneys for Plaintiffs
              200 Old Country Road, Suite 400
              Mineola, NY11501
              (516) 873-3000